## JAKE KIMBERLAIN v. THE STATE.

### No. 3035.   Decided November 2, 1904.

**1.—Murder—Continuance—Unconnected Threats Not Probably True.**

Where the court in explanation of the bill of exceptions certifies that the alleged threats set out in defendant's application for a continuance, were not probably true; that on the trial of the case neither defendant nor his wife testified to any previous trouble between deceased and defendant; nor did defendant testify that any threats of deceased were ever communicated to him and such explanation is borne out by the record, and that if the alleged threat was made it had no connection with the homicide and could not have justified.it, nor showed who was the aggressor in the difficulty, there was no error in overruling the application, or refusing a new trial.

**2.—Dying Declarations—Bill of Exceptions Should Show Facts.**

Where appellant desired to avail himself of the fact that dying declarations were improperly admitted, he should have stated all the testimony connected therewith, showing the environments under which it was admitted, otherwise his bill of exceptions could not be considered.

Appeal from the District Court.of Ward.   Tried below before Hon. James L. Shepherd.

Appeal from a conviction of murder in the second degree; penalty, twenty-five years imprisonment in the penitentiary.

The testimony of the wife of deceased, the principal State witness, is substantially as follows, to wit:   "Defendant and family moved into our house in the latter part of November, 1903, and occupied the two rooms on the east side of the house, and we occupied the other three rooms. On Sunday morning, my husband was out currying his horse, which was tied to a post of the gallery.  Mr. Kimberlain, the defendant, was in his room, and I heard him cursing in a loud voice, cursing our children because they were looking in at his window.   Deceased asked him who he was cursing; defendant said, 'Your young ones.'   My husband replied: 'I don't want you to curse my children, and besides I heard some talk you made yesterday morning that I did not like and I would like for you to explain.'   Defendant replied, 'Well I don't doubt that.' Deceased said, 'You come out here and explain to me!'   Defendant said, 'All right.'   Just at that instant, I heard his wife in her room scream: 'What are you going to do!   Don't you do it, don't you do it!'   I heard it distinctly.   My husband walked around to the east end of the porch, and defendant came out on the porch.   I could see my husband from where I was and also defendant.   I heard defendant say, 'What will you have?'   My husband answered, 'I want to know what you mean by that talk.'   Defendant said, 'I mean you are no sort of a man.'   My husband said, 'You are a liar!'   Defendant replied with an oath, 'You are another.'   Just then defendant backed behind the corner of the wall, and I saw my husband raise both hands, just at that instant I heard the shot fired.   My husband sprang on the porch and I rushed across there and they were grappling over the pistol, both having hold of it.   I tried

to disengage his hands and my husband said, 'He has killed me.' I seized defendant by the beard and turned his head round; Mrs. Kimberlain said to defendant: 'You have killed him, turn loose.' Defendant said, 'I will turn loose now,' and turned loose, and my husband staggered off the porch, took a few steps and fell. My husband had no arms about him at that time and no knuckles; he never owned any in his life." She also testified that on the day preceding the homicide, defendant in quarreling with his wife had also abused deceased and accused him of coming into and peeping into his rooms when defendant was away, and that this was what deceased was referring to, when he wanted defendant to explain. The testimony of physicians and others who came to help the deceased into the house shows the dying declarations of the deceased, which corroborated the testimony of his wife about how the difficulty occurred and that he was not armed.

The defendant and his wife testified that deceased was the aggressor and struck at the defendant and made for him and that defendant presumed he was armed, and shot him in self-defense.

*A. J. Wilson,* for appellant.

*Howard Martin,* Assistant Attorney-General, for the State.

HENDERSON, JUDGE.—Appellant was convicted of murder in the second degree, and his punishment assesed at confinement in the penitentiary for a term of twenty-five years; hence this appeal.

Appellant made a motion for continuance on account of the absence of a witness, by whom he alleged he could prove threats to take his life; said threats being communicated to him prior to the homicide. If threats are involved in the homicide, and would serve the purpose of either tending to justify appellant in the act of killing, or that he was the aggressor in the difficulty, then the court erred in overruling the continuance, as the diligence appears to be sufficient. The court in the explanation to the bill of exceptions certifies that the alleged threats were not probably true; that on the trial of the case neither Kimberlain nor his wife testified to any previous trouble between deceased and Kimberlain, nor the semblance thereof. Nor did Kimberlain testify to any threats on the part of deceased ever having been communicated to him by Dee McGee or any other person. We have examined the record and the explanation of the court appears to be correct. Appellant himself testified, that he had no trouble with deceased prior to the time of the homicide; that he was not mad at deceased. The testimony shows that the parties were living together in the same house, and the difficulty grew out of some trouble between the families, originating the day before the homicide. The alleged threat, which appellant says he could prove by the absent witness, occurred sometime prior to the homicide, and does not appear to have had any connection therewith. As stated by the court appellant testified to no threats, and made no reference to the communi-

cated threat, which he says he could have proved by the absent witness. Viewing this record, we believe the testimony of said absent witness was not probably true; but, even if true, we fail to see how it could have either tended to justify the homicide, or have tended to show who was the aggressor in the difficulty. The difficulty itself was witnessed by several persons who testify as to what occurred at the time. We do not believe the court erred in overruling the motion.

Appellant reserved a number of bills of exception to the introduction of dying declarations of deceased. The reason assigned in the bill as a ground of objection is, "that it was not sufficiently shown that at the time of making such declarations deceased was of sound mind and conscious of approaching death; and that said declarations were spontaneous and not made in answer to interrogatories directing the mind of deceased to make particular answers." The ground of objection is not a certificate that the facts were as stated. If appellant desired to avail himself of the fact that said dying declarations were improperly admitted, he should have stated all the testimony connected therewith, showing the environments under which it was admitted. This he did not do, and the bills can not be considered on that account. However, a recurrence to the statement of facts, if we were permitted to do that, shows appellant's objection is not tenable. It is further shown in the charge of the court that the judge submitted the question to the jury as to whether or not, dying declarations were made under circumstances to authorize their admission. We do not think the court was required to do this, as he was amply justified in admitting the testimony, and there was no issue of fact to be submitted to the jury. We do not think these objections are well taken.

We have examined the court's charge, and the charges requested, and, in our opinion the charge of the court sufficiently covered the issues in the case, and the requested charges were not necessary. We believe that the evidence amply authorized the verdict of the jury. There being no error in the record, the judgment is affirmed.

*Affirmed.*